**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DSA DETECTION LLC<br><br>Plaintiff,<br>v.<br><br>TIM BURTON, individually and ETD DIRECT SUPPLY LLC<br><br>Defendants. | Civil Action No. _______________ |

## COMPLAINT

Plaintiff DSA Detection LLC ("DSA") files this Complaint and demand for jury trial against Defendants Tim Burton and ETD Direct Supply LLC ("ETD Direct") (collectively "Defendants"). DSA brings this action to put an end to Defendants' willful and deliberate misappropriation of DSA's trade secret information, Mr. Burton's breach of his employment agreement with DSA, and the Defendants' violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

## PARTIES

1. DSA is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts and having a principal place of business at 120 Water Street, Suite 211, North Andover, MA 01845.

2. Upon information and belief, Mr. Burton resides in 45 Brookside Drive, Danville, NH 03819.

3. Upon information and belief, Defendant ETD Direct is a limited liability company organized and existing under the laws of the state of New Jersey and having its principal place of

business at 1121 Route 34 Suite N-404 Aberdeen, NJ 07747.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity of state citizenship among the parties and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because DSA's claims pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, presents a federal question.

6. This Court also has supplemental subject matter jurisdiction over the Massachusetts state law claims of trade secret misappropriation and breach of contract alleged herein pursuant to 28 U.S.C. § 1367(a). The claims arising under Massachusetts law are so related to the Computer Fraud and Abuse Act claim as to form part of the same case or controversy.

7. This Court has personal jurisdiction over Defendants with respect to all claims and causes of action asserted herein because Defendants have continuous and systematic contacts within this jurisdiction, at least through Mr. Burton's former employment with DSA and ETD Direct's sales within this jurisdiction. Furthermore, this dispute arises out of the Defendants' contacts with this jurisdiction.

8. Venue in this action is proper in this Court because this is the judicial district in which DSA resides, can be found, and transacts business. Upon information and belief, ETD Direct and Mr. Burton also transact significant business within this judicial district. Venue is therefore appropriate under 28 U.S.C. § 1391 (b) and (c) as well as 28 U.S.C. § 1400 (a).

## STATEMENT OF FACTS

### Background of DSA

9. DSA was founded in Massachusetts in 2005 by its President and CEO, Dave Rutter. DSA manufactures and distributes parts and supplies used in the operation and maintenance of explosive trace detection ("ETD") instruments, such as those used for airport security screening.

10. DSA's products include ETD "consumables," which includes supplies for testing and sampling for explosives and/or illicit substances using a trace detector. These products include proprietary sample "traps," which are designed to harvest particles of interest from various surfaces for analysis by an ETD instrument. Sample traps are produced under strict laboratory controls and manufactured according to proprietary techniques. DSA also sells specifically-designed calibration and verification traps, which may be used to calibrate and verify proper calibration of the ETD instruments that read sample traps.

11. DSA also sells a comprehensive line of inert ETD accessories, such as ETD workstations, screening bins, swabs, wipes, gloves, and related accessories for the ETD industry.

12. DSA also provides a complete line of improvised explosive device ("IED") training kits and anti-terrorism training kits. These kits include an Inert Threat Screening Kit, an Inert Domestic Terrorism Threat Kit, an Inert Guns and Knives Threat Kit, and an Inert Explosives Sample Kit, among several others. DSA offers online, classroom, and security officer trainings based on these training kits.

13. DSA's product line may be viewed at its web page – https://www.dsadetection.com/

## **Background of Tim Burton**

14. Defendant Tim Burton joined DSA in or about August 2006 as a Production Associate.

15. As a condition of his employment, Mr. Burton signed the DSA Employee Handbook, in which he agreed, among other things, to maintain the confidentiality of DSA's confidential information and trade secrets and not to compete with DSA for a period of 1 year after termination.

16. Mr. Burton's agreement to maintain the confidentiality of DSA's confidential information and trade secrets states as follows:

> **CONFIDENTIALITY**
>
> Information about the Company, its employees, customers, suppliers and vendors is to be kept confidential and divulged only to individuals within the Company with a need to receive, and who are authorized to receive, such information. "Confidential Information" shall mean and include any Company business or technical information, trade secrets, data, reports, studies, findings, formulae, specifications, designs, drawings, sketches, photographs, plans, samples, inventions, ideas, improvements, customer lists, sales, financials or other related material of any kind. If in doubt as to whether information should be divulged, err in favor of not divulging information and discuss the situation with your supervisor.
>
> All records and files maintained by the Company, in whatever form, are Confidential Information and remain the property of the Company. Records and files are not to be disclosed to any outside party in any manner without the express permission of the Human Resources Committee. Confidential Information may not be removed from the Company premises without express written authorization.
>
> You shall only use the Company's Confidential Information for the purpose of performing your job responsibilities at the Company. You agree not to directly or indirectly manufacture, process, label, package, supply, or sell, any product based on Confidential Information. You further agree not to carry on or engage in, directly or indirectly, on your own or through any individual, partnership, company, association, or entity, any business or other activity utilizing Confidential Information.

17. Mr. Burton's non-compete agreement states as follows:

> **<u>NON-COMPETE AND NON-SOLICITATION</u>**
>
> You acknowledge and agree that the nature of the Company's Confidential Information, proprietary information, and trade secret information to which the you have, and will continue to have, access to derives value from the fact that it is not generally known and used by others in the competitive industry in which the Company competes. You acknowledge and agree that, even in complete good faith, it would be impossible for you to work in a similar capacity for a competitor of the Company without drawing upon and utilizing information gained during employment with the Company. Accordingly, at all times during your employment with the Company and for a period of one (1) year after termination, for any reason, of such employment, you will not, directly or indirectly:
>
> (a) Engage in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise) that directly or indirectly competes with the Company's business anywhere in the world, including but not limited to any business or enterprise that develops, manufacturers, markets, or sells any product or service that competes with any product or service developed, manufactured, marketed or sold, or planned to be developed, manufactured, marketed or sold, by the Company; or
>
> (b) either alone or in association with others (i) solicit, or facilitate any organization with which you are associated in soliciting, any employee of the Company to leave the employ of the Company; (ii) solicit for employment, hire or engage as an independent contractor, or facilitate any organization with which you are associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed with the Company during your employment with the Company; or (iii) solicit business from or perform services for any customer, supplier, licensee or business relation of the Company, induce or attempt to induce, any such entity to cease doing business with the Company, or in any way interfere with the relationship between any such entity and the Company.
>
> You hereby explicitly acknowledge that the geographic and temporal scope of this non-compete and non-solicitation agreement is reasonable, and supported by valuable consideration including your employment, salary, benefits and bonuses, if applicable. You hereby acknowledge the enforceability, and waive the right to challenge the enforceability, of this non-compete and non-solicitation agreement.

18. A true and correct copy of the DSA Employee Handbook, signed by Mr. Burton, is filed under seal herewith as Exhibit A.

19. During his time at DSA, Mr. Burton was promoted several times and held the

positions of Senior Associate – Operations (2008), Production Engineer (2009), Production Manager (2010), Operations Manager (2011), and Director of Operations (2012).

20. At all times during his employment with DSA, Mr. Burton was intimately involved in the research, development, design, and production of DSA's new product offerings.

21. Mr. Burton's employment with DSA was terminated in July of 2014.

22. Upon information and belief, Mr. Burton became the President of EDT Direct on or about September 2015.

**Background of ETD Direct**

23. Upon information and belief, ETD Direct was incorporated in New Jersey in August of 2012 by Amy Vandertuyn.

24. ETD Direct is a direct competitor of DSA's and ETD Direct and DSA compete for many of the same customers in the ETD consumables marketplace.

25. Upon information and belief ETD Direct's initial product offering included sample media products only, including sample traps for the Itemiser DX and IONSCAN 500DT trace detectors and a verification pen for the IONSCAN 500DT.

26. Upon information and belief, ETD Direct re-launched its web page in or about late 2015 or early 2016 around the same time that Mr. Burton started working for ETD Direct.

27. Attached hereto as Exhibit B is a true depiction of ETD Direct's web page as it appeared on August 1, 2015.

28. Attached hereto as Exhibit C is a true depiction of ETD Direct's web page as it appeared on March 3, 2016.

29. Upon information and belief, around the same time that it re-launched its web page, ETD Direct also launched several new products, including calibration and verification

traps for the Itemiser DX trace detector. ETD Direct also launched a clearing spray, dopants, various checkpoint accessories, and sample swabs for the Implant QS-B220 trace detector.

**Mr. Burton was Privy to DSA's Confidential and Trade Secret Information**

**DSA's CT1319P Calibration Traps and VT1336P Verification Traps**

30. In or about 2009, Mr. Burton worked on the research and development for DSA's calibration traps (DSA Part No. CT1319P) and verification traps (DSA Part No. VT1336P) for the Itemiser DX trace detector. As part of DSA's development process, Mr. Burton helped develop DSA's trade secret formula for a proprietary solution that is applied to each calibration and verification trap during the production process. Mr. Burton was also aware that DSA's trade secret formula for the solution could only be prepared using, among other things, two trade secret components that are only available from a single vendor.

31. In or about April of 2010, Mr. Burton authored the production procedures for DSA's calibration traps (DSA Part No. CT1319P), which is filed under seal herewith as Exhibit D. As shown in Exhibit D, the Production Procedures for the CT1319P calibration traps was at all times marked as being DSA's confidential material.

32. In or about April of 2010, Mr. Burton authored the production procedures for DSA's verification traps (DSA Part No. VT1336P), which is filed under seal herewith as Exhibit E. As shown in Exhibit E, the Production Procedures for the VT1336P verification traps was at all times marked as being DSA's confidential material.

33. DSA expended significant resources in terms of both employee time and financial resources to develop its designs and formulas for its CT1319P calibration traps and VT1336P verification traps.

34. DSA's designs and formulas for its CT1319P calibration traps and VT1336P

verification traps are not generally known outside of DSA and DSA derives commercial value from the secrecy of its designs and formulas for its CT1319P calibration traps and VT1336P verification traps.

35. DSA's designs and formulas for its CT1319P calibration traps and VT1336P verification traps are also the subject of reasonable steps to maintain secrecy. For example, DSA documents containing trade secret information concerning these products are marked as being "confidential," DSA materials as shown, for example, in Exhibits D and E. DSA also limited access to its trade secret information concerning its designs and formulas for its CT1319P calibration traps and VT1336P verification traps to its employees on a "need-to-know" basis. Also, as a condition of employment, all DSA employees are required to sign the employee handbook, which includes a confidentiality and non-compete requirement, as discussed above.

**DSA's ST1269P Sample Traps**

36. Mr. Burton also had access to DSA's confidential and trade secret information concerning DSA's designs, formulas, and manufacturing process relating to its sample traps for the QS-B220 trace detector (DSA Part No. ST1269P). The ST1269 sample traps were developed confidentially in concert with Implant Sciences, Inc., who is the manufacturer of the QS-B220 trace detector. DSA was given valuable, confidential insights into the operation and requirements of the QS-B220 from its manufacturer, enabling DSA to design a compatible sample trap. These requirements and insights are not generally known by DSA's competitors and provided DSA an exclusive opportunity to design, manufacture, and sell sample traps for the QS-B220 trace detector. Mr. Burton was an active participant in the design process for DSA's ST1269 sample traps and was therefore privy to confidential and trade secret information concerning the design requirements, design, and production procedures for this product.

37. Between 2010 and 2013, Mr. Burton authored and edited the production procedures for DSA's ST1269 sample traps, which is filed under seal herewith as Exhibit F. As shown in Exhibit F, the Production Procedures for the ST1269 sample traps was at all times marked as being DSA's confidential material.

38. DSA expended significant resources in terms of both employee time and financial resources to develop its designs, formulas, and manufacturing procedures for its ST1269 sample traps.

39. DSA's designs, formulas, and manufacturing process for its ST1269 sample traps are not generally known outside of DSA and DSA derives commercial value from the secrecy of its designs and formulas for its ST1269 sample traps.

40. DSA's designs, formulas, and manufacturing process for its ST1269 sample traps are also the subject of reasonable steps to maintain secrecy. For example, DSA documents containing trade secret information concerning this product are marked as being "confidential" DSA materials. DSA also limited access to its trade secret information concerning its ST1269 sample traps to its employees on a "need-to-know" basis. Also, as a condition of employment, all DSA employees are required to sign the employee handbook, which includes a confidentiality and non-compete requirement, as discussed above.

**DSA's D5087 Positive Ion Dopant and D5810 Negative Ion Dopant**

41. In or about 2009, Mr. Burton worked on the research and development for DSA's positive ion dopant (DSA Part No. D5087) and negative ion dopant (DSA Part No. D5810). These dopants are compatible with the Itemiser DX, VaporTracer, and MobileTrace trace detectors. As part of DSA's development process, Mr. Burton helped develop DSA's trade secret design and manufacturing processes for both the D5087 and D5810 dopants.

42. In or about July of 2010, Mr. Burton authored the production procedures for DSA's D5087 and D5810 dopants, which are filed under seal herewith as Exhibit G and H, respectively. As shown in Exhibits G and H, the Production Procedures for the D5087 and D5810 dopants were at all times marked as being DSA's confidential material.

43. DSA expended significant resources in terms of both employee time and financial resources to develop its designs, formulas, and manufacturing process for its D5087 and D5810 dopants.

44. DSA's designs, formulas, and manufacturing process for its D5087 and D5810 dopants are not generally known outside of DSA and DSA derives commercial value from the secrecy of its designs, formulas and manufacturing process for the D5087 and D5810 dopants.

45. DSA's designs, formulas and manufacturing process for the D5087 and D5810 dopants are also the subject of reasonable steps to maintain secrecy. For example, DSA documents containing trade secret information concerning these products are marked as being "confidential," DSA materials as shown, for example, in Exhibits G and H. DSA also limited access to its trade secret information concerning its designs, formulas and manufacturing process for the D5087 and D5810 dopants to its employees on a "need-to-know" basis. Also, as a condition of employment, all DSA employees are required to sign the employee handbook, which includes a confidentiality and non-compete requirement, as discussed above.

**DSA's DVP1883 Verification Pen**

46. In or about 2012, Mr. Burton also worked on the research and development for DSA's verification pen for use with the IONSCAN 500DT trace detector (DSA Part No. DVP1883). DSA's DVP1883 verification pen is produced under strict laboratory quality controls using a trade secret design.

47. As part of DSA's development process, Mr. Burton helped develop DSA's trade secret design and manufacturing processes for the DVP1883 verification pen.

48. In or about August of 2012, Mr. Burton authored the production procedures for DSA's DVP1883 verification pen, which is filed under seal herewith as Exhibit I. As shown in Exhibit I, the Production Procedures for the DVP1883 verification pen was at all times marked as being DSA's confidential material.

49. DSA expended significant resources in terms of both employee time and financial resources to develop its design and manufacturing process for the DVP1883 verification pen.

50. DSA's design and manufacturing process for its DVP1883 verification pen is not generally known outside of DSA and DSA derives commercial value from the secrecy of its design and manufacturing process for the DVP1883 verification pen.

51. DSA's design and manufacturing process for the DVP1883 verification pen is also the subject of reasonable steps to maintain secrecy. For example, DSA documents containing trade secret information concerning this product are marked as being "confidential" DSA material as shown, for example, in Exhibit I. DSA also limited access to its trade secret information concerning its design and manufacturing process for the DVP1883 verification pen to its employees on a "need-to-know" basis. Also, as a condition of employment, all DSA employees are required to sign the employee handbook, which includes a confidentiality and non-compete requirement, as discussed above.

**DSA's Customer and Supplier Lists**

52. During his time with DSA, Mr. Burton was also responsible for maintaining DSA's trade secret customer and supplier contact list.

53. DSA maintained its customer list on a web-based customer contact platform

called Constant Contact, which maintains its headquarters in Waltham, Massachusetts. *See* http://www.constantcontact.com/.

54. While employed by DSA, Mr. Burton maintained DSA's trade secret customer and supplier contact list using the Constant Contact login – info@DSAdetection.com.

55. By 2015, DSA's Constant Contact account included the contact information for over 300 DSA customers. Mr. Burton also had full access to and frequently used the supplier data base.

56. DSA's trade secret customer and supplier list is not generally known to the public and has been compiled by DSA through years of in-person marketing and customer contact development. DSA's trade secret supplier list has also been developed through years of supplier contacts, negotiations, and contract performance. It has taken years for DSA to develop its trade secret customer and supplier contact lists at a significant cost to DSA in terms of both employee time and financial investment.

57. DSA derives significant value from its trade secret customer and supplier lists. DSA has identified its most valuable and profitable customers over the years as well as its most cost-effective reliable suppliers. As DSA has honed its business practices, having a go-to list of valuable supplier contacts has allowed DSA to operate more profitably and efficiently.

58. DSA's trade secret customer and supplier lists are also the subject of reasonable efforts to maintain secrecy. For example, the login details for DSA's Constant Contact account were shared among DSA employees only on a need-to-know basis. Also, as a condition of employment, all DSA employees are required to sign the employee handbook, which includes a confidentiality and non-compete requirement, as discussed above. The confidentiality and non-compete agreement specifically identifies "customer lists" as a protected category of trade

secrets under the agreement.

**DSA Terminated Mr. Burton's Employment**

59. In or about May of 2014, DSA's information technology services personnel discovered that Mr. Burton had improperly accessed and downloaded restricted files on DSA's network and had shared the stolen information with other DSA employees.

60. Mr. Burton was confronted by a DSA manager regarding his illicit network activities and he admitted to improperly accessing and downloading the restricted information.

61. On or about May 27, 2014, DSA terminated Mr. Burton's employment.

**Mr. Burton Joins ETD Direct and Begins Copying DSA Products**

62. In or about December 2015, Mr. Burton updated his LinkedIn profile to indicate that he had been hired by ETD Direct as its vice president of operations.

63. In or about January 2016, Mr. Burton again updated his LinkedIn profile to indicate that he had been the president of ETD Direct since September 2015.

64. Since Mr. Burton's departure from DSA, ETD Direct has released several new products in competition with DSA including, but not limited to, the MD1965 calibration traps, the MD1966 verification traps, the SD3203 verification standard pen, the IS1000 sample traps, the MD5810 negative ion dopant, and the MD5087 positive ion dopant.

65. Upon information and belief, Mr. Burton helped ETD Direct develop its MD1965 calibration traps using DSA's trade secret information relating to DSA's CT1319P calibration traps.

66. Upon information and belief, Mr. Burton helped ETD Direct develop its MD1966 verification traps using DSA's trade secret information relating to DSA's VT1336P verification traps.

67. Upon information and belief, Mr. Burton helped ETD Direct develop its SD3203 verification standard pen using DSA's trade secret information relating to DSA's DVP1883 verification pen.

68. Upon information and belief, Mr. Burton helped ETD Direct develop its IS1000 sample traps using DSA's trade secret information relating to DSA's ST1269P sample traps.

69. Upon information and belief, Mr. Burton helped ETD Direct develop its MD5810 negative ion dopant using DSA's trade secret information relating to DSA's D5810 negative ion dopant.

70. Upon information and belief, Mr. Burton helped ETD Direct develop its MD5087 positive ion dopant using DSA's trade secret information relating to DSA's D5087 positive ion dopant.

71. In February 2016, DSA, was also contacted by one of its confidential part suppliers, regarding a phone call it had received from Mr. Burton. Mr. Burton was requesting samples of a part DSA confidentially purchases from this particular supplier under an exclusive agreement. When the confidential supplier asked Mr. Burton what the samples were for, Mr. Burton stated he was trying to reverse engineer a product but couldn't say what the product was. The confidential supplier found Mr. Burton's request suspicious because the requested part is specific to products made by DSA and their inventory is allocated to specifically for DSA. The confidential supplier inquired whether Mr. Burton had ever worked for DSA and he falsely claimed that he had not. At that time the confidential supplier advised Mr. Burton that they would not be able to provide Mr. Burton with any samples.

72. Upon information and belief, Mr. Burton was only aware of the identity of DSA's confidential supplier because of his time working at DSA and Mr. Burton violated his

employment agreement with DSA by using his knowledge of DSA's confidential supplier information in an effort to develop knockoffs of DSA's products.

**Mr. Burton Steals DSA's Customer List**

73. On December 10, 2015, DSA received an email from Constant Contact requesting that DSA verify a new email account that had become associated with DSA's Constant Contact account. The December 10, 2015 email, which is attached hereto as Exhibit J, states as follows:

> Dear ***Tim***,
>
> Thank you for using Constant Contact! If you haven't done so already, ***please confirm that you want to use this address*** in your Constant Contact account. Once you verify you can begin to send emails.
>
> Account Name: ***tim@etddirect.com***

*See* Ex. K (emphasis added).

74. Based on the email from Constant Contact, DSA became aware that Mr. Burton had accessed DSA trade secrets and was attempting to steal its trade secret customer and supplier list.

75. On information and belief Mr. Burton accessed and downloaded DSA's trade secret customer list after his employment with DSA was terminated.

76. On information and belief, Mr. Burton has used and continues to use the stolen information from DSA's trade secret customer list to unfairly compete with DSA.

77. Upon receiving the email verification request, DSA took steps to freeze its Constant Contact account.

**COUNT I – COMPUTER FRAUD AND ABUSE ACT 18 U.S.C. § 1030(a)(2)**
**(Against Tim Burton and ETD Direct)**

78. DSA restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

79. Upon information and belief, Mr. Burton obtained DSA's trade secret customer and supplier lists by accessing and/or downloading the information from DSA's Constant Contact account.

80. Upon termination from DSA, Mr. Burton was no longer authorized to access DSA's Constant Contact account.

81. Upon information and belief, Mr. Burton deliberately accessed DSA's Constant Contact accounts after being terminated by DSA with the full knowledge that he was no longer authorized to do so.

82. DSA's Constant Contact accounts are housed within Constant Contact's network servers, which constitute "protected computers" pursuant to 18 U.S.C. § 1030(a)(2) at least because they contain password-protected information.

83. Upon information and belief, Mr. Burton was operating in his capacity as an officer of ETD Direct when he improperly accessed DSA's Constant Contact account and was induced to access DSA's Constant Contact account by his employer, ETD Direct, in order to gain access to DSA's valuable trade secret information stored therein.

84. The damage to DSA resulting from ETD Direct and Mr. Burton's violation of the Computer Fraud and Abuse Act include, at a minimum, (a) the competitive advantages wrongfully taken from DSA and imparted to ETD Direct; (b) future lost sales and/or other business opportunities; (c) future lost profits; and (d) loss of reputation, goodwill, and customer relationships.

**COUNT II - MISAPPROPRIATION OF TRADE SECRETS**
**(Against Tim Burton and ETD Direct)**

85. DSA restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

86. Mr. Burton had access to DSA's trade secret information through his prior role working in research and development on behalf of DSA.

87. DSA's trade secret information, as described herein, including information relating to its CT1319P calibration traps, VT1336P verification traps, ST1269P sample traps, D5087 positive ion dopants, D5810 negative ion dopants, DVP1883 verification pen, and customer/supplier lists constitutes trade secrets as defined by the common law of the Commonwealth of Massachusetts.

88. Mr. Burton owes DSA a duty, pursuant to his employment agreement with DSA, to neither use nor disclose DSA's trade secret information acquired in the course of his employment for the benefit of anyone other than DSA.

89. ETD Direct knew or had reason to know that DSA's proprietary information, as described herein constitutes trade secrets by the common law of the Commonwealth of Massachusetts.

90. Upon information and belief, ETD Direct used improper means to obtain DSA's trade secret information including, but not limited to, soliciting the disclosure of such information from DSA's former employee, Mr. Burton, through inducing Mr. Burton to breach the terms of his employment agreement with DSA, and by gaining access to and using DSA's trade secret customer list through improper means.

91. Upon information and belief, Mr. Burton disclosed and used DSA's trade secret information in connection with the competitive activities of ETD Direct.

92. The damage to DSA resulting from Mr. Burton and ETD Direct's misappropriation of DSA's trade secrets and other proprietary and confidential information includes, at a minimum, (a) the competitive advantages wrongfully taken from DSA and

imparted to ETD Direct; (b) future lost sales and/or other business opportunities; (c) future lost profits; and (d) loss of reputation, goodwill, and customer relationships.

**COUNT III – BREACH OF CONTRACT**
**(Against Tim Burton)**

93. DSA restates and incorporates the above paragraphs of this Complaint as if set forth fully herein.

94. Mr. Burton agreed in his employment agreements with DSA to maintain the confidentiality of DSA's confidential, proprietary, and trade secret information.

95. Mr. Burton received valuable consideration for his promise to maintain the confidentiality of DSA's confidential, proprietary, and trade secret information.

96. DSA relied on Mr. Burton's promises in continuing his employment with DSA and in trusting him with DSA's confidential, proprietary, and trade secret information.

97. Mr. Burton materially breached his employment agreements with DSA by taking, disclosing to third parties, and/or using DSA's confidential, proprietary, and trade secret information for the benefit of ETD Direct.

98. DSA has suffered damages as a result of Mr. Burton's breaches of contract. The damages include, at a minimum, (a) the loss of confidentiality regarding DSA's confidential and proprietary information; (b) the competitive advantages wrongfully imparted to ETD Direct; (c) lost sales and other business opportunities; (d) future lost sales and/or other business opportunities; (e) current and future loss of reputation and goodwill.

**PRAYER FOR RELIEF**

WHEREFORE, DSA requests that this Court grant the following relief, as well as any other relief the Court may deem proper:

a. Enter judgment in favor of DSA and against Defendants on all counts of the Complaint;

b. Award preliminary and permanent injunctive relief against Defendants as the Court deems appropriate on all counts;

c. Award compensatory damages in an amount to be proven at trial;

d. Award consequential damages in an amount to be proven at trial;

e. Order an accounting of any and all of Defendants' illicit profits;

f. Award applicable pre-judgment and post-judgment interest;

g. Award DSA its attorneys' fees and costs of suit; and

h. Award such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

DSA demands a trial by jury on all issues so triable.

Dated: March 7, 2016

Respectfully submitted,

DSA Detection LLC,

By its Attorneys:

/s/ *Craig R. Smith*

Craig R. Smith (BBO No. 636,723)
William J. Seymour (BBO No. 687,181)
LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA 02142
Telephone: (617) 395-7000
Facsimile: (617) 395-7070